UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

United States of America,

          Plaintiff,

      –v–

Felix Parrilla, Gary Thomas, and Kirk Tang Yuk,

        Defendants.

---

No. 13 Cr. 360 (AJN)

MEMORANDUM
AND ORDER

ALISON J. NATHAN, District Judge:

    Before the Court are various pretrial motions from the Defendants Felix Parrilla, Gary Thomas, and Kirk Tang Yuk. For the reasons that follow, the Defendants' motions for joinder of their motions are GRANTED, Tang Yuk's motions are DENIED, Thomas' motion is DENIED, and Parrilla's motion is DENIED in part and the Court reserves decision in part.

## I.    BACKGROUND

    This case involves allegations of a narcotics conspiracy. The following allegations are taken from the indictment and various affidavits, warrant applications, and other exhibits presented by the parties.

    According to the government, the investigation of the Defendants began after the arrest and seizure of two individuals and roughly 25 kilograms of cocaine in New York City on September 22, 2012. *See, e.g.*, Conniff Decl. Ex. B (Johnston Aff., Jan. 31, 2013) at 11. One arrestee became a cooperating witness ("CW-1") and provided information about the cocaine and its origins. According to CW-1, the 25 kilograms seized in New York were part of an 80-kilogram load from Antigua and routed through Saint Croix, United States Virgin Islands, where Gary Thomas and CW-1 hid the cocaine in a false-bottomed crate loaded with automobile parts. *Id.* After the crate was shipped to Miami, Florida, CW-1 unloaded the cocaine and separated it

for distribution. *Id.* CW-1 gave two kilograms to Tang Yuk to sell on consignment, took 25 kilograms for distribution in New York, and delivered the remaining 53 kilograms to Parrilla at a location in Fort Lauderdale, Florida. *Id.* at 12. Warrantless canine sniffs and a sneak-and-peek search pursuant to a warrant were conducted in September 2012. *Id.* at 15–16.

The Government conducted a wiretap investigation targeted at the Defendants, seeking and obtaining a series of judicial orders beginning in October 2012, permitting the interception of communications on various telephones associated with the defendants. *Id.* at 14. The Government conducted surveillance pursuant to the orders, intercepting large volumes of phone calls and other communications.

On May 16, 2013, a grand jury returned the Indictment in this case, charging Parrilla, Thomas, Tang Yuk with a single count of conspiracy to distribute and possess with the intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A), 846. The Indictment specifically alleges that they "intentionally and knowingly, did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws," and that "[i]t was a part and an object of the conspiracy that" the defendants "would and did distribute and possess with the intent to distribute . . . five kilograms and more of . . . cocaine." Indictment ¶¶ 1–3.

Arrest warrants were issued out of the Southern District of New York, and on June 5, 2013, agents arrested Parrilla at a home in Ocala, Florida. Gov. Mem., Ex. M (Smith Report). According to the DEA, after Parrilla's arrest, agents conducted a protective sweep and seized cell phones and other items from a bedroom within the home. *Id.* According to Homeland Security Investigations, other agents arrested Tang Yuk while he was driving a vehicle in Miramar, Florida, and seized a phone and iPad. Conniff Decl., Ex. G (Papure Affidavit), ¶ 8.

The Defendants were all subsequently brought to the Southern District of New York. Tang Yuk filed motions for dismissal of the indictment, suppression of evidence, and other relief. Dkt. No. 74. Thomas moves to transfer his case to Saint Croix. Dkt. No. 78. Parrilla

moves to suppress evidence.  Dkt. No. 81.  The Government opposed all motions.  Dkt. No. 88. Tang Yuk and Parrilla replied in support of their motions.  Dkt. Nos. 95–97.

## II.  JOINDER OF MOTIONS

The Defendants have each requested permission to join in their co-defendants' motions. *See* Parrilla Mem. 32 (moving to incorporate and adopt his co-defendants motions, while reserving the right to object to any motion not intended to be adopted or incorporated); Thomas Mem. 1 (moving to join his co-defendants motions "to the extent that any such motion can be applied to him and is not inconsistent with any of his positions"); Tang Yuk Motion 1 (seeking "such other and further relief as requested in the motions of any co-defendants").  The Court grants these requests, and the decisions made with respect to each co-defendant's motion shall apply where appropriate to the others as well.

## III.  FOURTH AMENDMENT MOTIONS TO SUPPRESS

Tang Yuk and Parrilla each bring a motion to suppress evidence they claim was obtained in violation of the Fourth Amendment.  Tang Yuk moves to suppress a cell phone and iPad seized following his arrest.  Parrilla seeks to suppress two cell phones seized after his arrest, as well as two canine sniffs and their fruits.  The Government opposes suppression and maintains that all motions may be denied without an evidentiary hearing.  On April 18, 2014, the Court ordered oral argument and supplemental briefing with regard to Parrilla's motion to suppress the two canine sniffs.  Dkt. No. 108.  The Court reserves decision on that issue, but for the reasons that follow, denies Tang Yuk's motion to suppress, and denies Parrilla's motion to suppress the cell phones.

### A.  Parrilla Arrest and Cell Phone Seizure

Parrilla moves to suppress two cell phones seized from a home following his arrest on June 5, 2013.  Parrilla Mem. 27–31.  Parrilla argues that agents performed an unlawful warrantless search of a home at which he was an overnight guest.  Parrilla Mem. 27.  The

Government opposes and argues the search and seizure were lawful. The Court concludes that the cell phones were lawfully seized after being observed in plain view during a lawful protective sweep into the master bedroom, so this motion is denied.

Criminal defendants seeking to suppress evidence must first make a showing that their own Fourth Amendment rights were violated by a challenged search or seizure. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978). Parrilla's affidavit asserts that he was arrested when he opened the front door of the residence at about 12:20 PM on June 5, 2013; that DEA agents entered the home without a search warrant or his consent or anyone else's consent; and that the agents "conducted a full blown search of the residence," seizing two of his cell phones that were located inside. Parrilla Aff. ¶ 6–7. He also makes the undisputed contention he was staying at the home as an overnight guest of his children's mother, who owned the house and lived there with their children. Parrilla Aff. ¶ 6. As an overnight guest, Parrilla was entitled to a reasonable expectation of privacy in the house where he was arrested. *Minnesota v. Olson*, 495 U.S. 91, 98 (1990). Because Parrilla has shown that the "the place . . . subjected to the warrantless search is one in which [he] . . . had a reasonable expectation of privacy, the burden of showing that the search fell within one of the exceptions to the warrant requirement is [shifted] on[to] the government." *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999) (citing *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993).

Warrantless searches are "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception is the protective sweep exception, through which officers making an arrest at a home may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334 (1990). The issue then is whether the master bedroom of the home was an "immediately adjoining" space.

4

According to the report by DEA Special Agent Paul W. Smith, the search of the home was a "security sweep, for safety purposes." Gov. Mem., Ex. M (Smith Report), ¶ 5.  Smith's report implies that the master bedroom was near the front door, stating that Parrilla was seen looking at the agents through the window of the master bedroom after they knocked on the front door.  *Id.* at ¶ 3.

Parrilla argued in his opening brief that the master bedroom was an "upstairs bedroom." Parrilla Mem. 29.  In response, the Government submitted a document that it represents is a floor plan of the house.  Gov. Mem., Ex. N.  This floor plan indicates that in fact the home has only one story.  The floor plan shows that the front door opens into a living/dining room, which is adjacent to a master bedroom located at the front corner of the house.  Parrilla's reply claims he "has raised material issues of fact" but does not dispute the accuracy of floor plan submitted by the government.  Parrilla Reply ¶ 16.  Parrilla offers only a conclusory statement—in his briefing, not in his affidavit—that "the master bedroom was not immediately adjoining the place of Mr. Parrilla's arrest." *Id.* ¶ 10.

"Particularly when . . . an apartment is small, an immediately adjoining room is searchable under the 'protective sweep' exception." *United States v. Alejandro*, 100 F. App'x 846, 848 (2d Cir. 2004) (citing *United States v. Lauter*, 57 F.3d 212, 216–17 (2d Cir. 1995)). Here, the floor plan and description in Smith's report show that the master bedroom was "immediately adjoining" the room to which the front door opened, and thus within the permissible scope of a protective sweep conducted without cause.  *See United States v. Chervin*, No. 10 Cr. 918 (RPP), 2011 WL 4373928, at *4 (S.D.N.Y. Sept. 20, 2011) ("[C]ourts have held that arrests made in hallways with adjacent bedroom entrances are subject to the *Buie* 'immediately adjoining' protective sweep."). Since the master bedroom was merely the width of one room away from the place of arrest, it is a place from which an attack could be immediately launched.  The Court therefore finds that the search of the master bedroom was within the scope of a permissible protective sweep.

Although warrantless seizures are also *per se* unreasonable, the well-established plain view exception allows officers who "are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, [to] . . . seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *see United States v. Gamble*, 388 F.3d 74, 76 (2d Cir. 2004) ("The 'plain view' exception authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity.") (citation and quotation marks omitted).  The combined effect of the two doctrines articulated above is that "[p]atently incriminating evidence that is in plain view during a proper security check may be seized without a warrant." *United States v. Rudaj*, 390 F. Supp. 2d 395, 400 (S.D.N.Y. 2005) (quoting *Kiyuyung*, 171 F.3d at 83), *aff'd sub nom. United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009).

Parrilla's only objection to the seizure of the phones under the plain view exception is his contention that the agents were not lawfully present in the bedroom. *See* Parrilla Mem. 30.  It is undisputed that the phones were observed in plain view, and that, in the context of an arrest for narcotics conspiracy, their incriminating nature was immediately apparent.  Given the Court's finding that the agents were lawfully present in the bedroom to conduct a protective sweep, the seizure was reasonable under the plain view exception. *See Kiyuyung*, 171 F.3d at 83.

In the alternative, Parrilla requests an evidentiary hearing "to determine the basis for, timing and scope of the protective sweep of the master bedroom."  Parrilla Reply ¶ 16 (citing *United States v. English*, No. 10 Cr. 431 (CM), 2011 WL 3366490 (S.D.N.Y. July 29, 2011)).  However, a defendant is not entitled to an evidentiary hearing on a motion to suppress unless they "can show a contested issue of material fact with respect to the issue for which the hearing was requested." *United States v. Del Rosario*, No. 12 Cr. 81 (KBF), 2012 WL 1710923, at *2 (S.D.N.Y. May 11, 2012).  A hearing is not required without moving papers that are "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Watson*, 404

F.3d 163, 167 (2d Cir. 2005) (quoting *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992)) (internal quotation marks omitted); *see United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *3 (S.D.N.Y. Dec. 3, 2013).  Against this standard, Parrilla's allegation that a full blown search occurred is too general and conclusory to make an evidentiary hearing necessary.  *See United States v. Dewar*, 489 F. Supp. 2d 351, 359–60 (S.D.N.Y. 2007).  Since "[d]efendants must present [or] submit a sworn affidavit from one with personal knowledge of the underlying facts" to create a factual dispute requiring a hearing, *id.*, Parrilla's assertion, contained not in his affidavit, but his memorandum of law, that the master bedroom was upstairs is an insufficient "[a]ttorney allegation[] [that] cannot provide the Court with a basis for making a finding of fact."  *United States v. Marquez*, 367 F. Supp. 2d 600, 603–04 (S.D.N.Y. 2005) (citing *Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) (noting that a memorandum of law "is not evidence at all")); *see United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967) (upholding denial of motion to suppress evidence obtained under a search warrant without an evidentiary hearing, because "there was no factual issue to be resolved" when the suppression motion was grounded in an the defendant's attorney's affidavit lacking personal knowledge of the facts at issue).  Had Parrilla provided testimony in his affidavit that the master bedroom was upstairs, he arguably would have created a material dispute of fact with respect to whether the room was "immediately adjoining."[1]  He did not.  Nor does his reply memorandum contest the Government's factual assertions regarding the layout of the home.  Accordingly, Parrilla's motion to suppress the phones is denied without a hearing.

---

[1] Even if he had done so, it is not clear than an evidentiary hearing would have been necessary, given the Government's argument that the sweep was permissible because "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334.  Nevertheless, since Parrilla has not created a dispute over whether the master bedroom was "immediately adjoining," the Court does not reach this issue.

###### B.    Tang Yuk Phone and iPad Seizure

Tang Yuk also moves to suppress a phone and iPad seized from a vehicle he was driving immediately prior to his arrest on June 5, 2013, arguing the government has not established a lawful basis for their seizure. Tang Yuk Suppression Mem. 11. Tang Yuk argues that "it is entirely unclear what circumstances led to this seizure," given that "[t]he government's affidavit in support of a search warrant for these items provides almost no detail regarding the circumstances of the seizure." Tang Yuk Suppression Mem. 11. Tang Yuk thus concludes that the lack of factual evidence requires suppression. Tang Yuk Suppression Reply 6.[2] The Government's response did not add any evidence pertaining to this seizure, and claimed instead that Tang Yuk failed to meet his burden of calling the search or seizures into question. Gov. Mem. 48. The Court agrees, and finds that Tang Yuk has failed to present the necessary evidence establishing that the agents' entry into the car violated his Fourth Amendment rights. *See Rakas*, 439 U.S. at 130 n. 1.

Evidence of "[m]ere use and control of a car does not satisfy a defendant's burden of showing a legitimate expectation of privacy, because the vehicle may have been stolen." *United States v. Medina*, No. 94 Cr. 872 (SAS), 1998 WL 241724, at *4 (S.D.N.Y. May 11, 1998) (citing *United States v. Ponce*, 947 F.2d 646, 649 (2d Cir. 1991)). "The burden is not on the police to show that a defendant was in the car illegitimately. The burden is on the defendant to show a legitimate basis for being in the car, and that showing cannot be made simply by having been observed using the car." *Lacey v. Perez*, No. 10 Civ. 1460 (SJF), 2013 WL 1339418, at *5 (E.D.N.Y. Mar. 28, 2013) (quoting *Ponce*, 947 F.2d at 649) (alterations and internal quotation marks omitted).

The record is devoid of evidence that Tang Yuk owned the vehicle or had any license or permission to use it. *See* Conniff Decl., Ex. G (Papure Application and Affidavit); Ex. H

---

[2] To the extent that Tang Yuk's  statement that "the government should be required to produce particulars regarding the seizure," Tang Yuk Suppression Reply 6, requests additional discovery, his motion has not complied with Local Criminal Rule 16.1 and is therefore denied.

(Department of Homeland Security Report of Investigation). According to the documents he submitted, Tang Yuk was arrested after agents stopped a vehicle he was driving, and the phone and iPad were seized from within the vehicle. Neither document establishes that Tang Yuk had any property rights in the vehicle, or that he had a legitimate expectation of privacy in the vehicle. Having shown "neither ownership of [the] car nor license from the owner to use the car," Tang Yuk "cannot challenge a search of the vehicle." *Medina*, 1998 WL 241724, at *4 (citing *United States v. Sanchez,* 635 F.2d 47, 64 (2d Cir. 1960)).

Without evidence showing that the search violated Tang Yuk's rights, there is no basis for suppression. There is likewise no basis for the evidentiary hearing Tang Yuk requests, because his moving papers do not "state sufficient facts which, if proven, . . . require[] the granting of the relief requested." *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969); *see United States v. Getto*, 729 F.3d 221, 226 n. 6 (2d Cir. 2013) (upholding district court's decision not to hold an evidentiary hearing because the defendant's "allegations, even if assumed to be true, would not require suppression"). Tang Yuk "has things completely backwards. It is *his* burden to show the existence of a factual dispute[, a]nd it is *his* burden to submit an affidavit based on personal knowledge evidencing such a dispute." *United States v. Cicuto*, No. 10 Cr. 138 (PAC), 2010 WL 3119471, at *4 (S.D.N.Y. Aug. 6, 2010) (citations omitted). Tang Yuk did not meet these burdens, so his motion to suppress is denied without a hearing.

## IV.    TITLE III MOTIONS TO SUPPRESS

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 permits court-ordered interceptions of communications. 18 U.S.C. § 2518. Under Title III, a defendant may move to suppress evidence obtained through a Title III interception order on the grounds that "the communication was unlawfully intercepted," or that "the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a). Parrilla and Tang Yuk each move to suppress evidence collected under certain wiretap orders, arguing the orders fail to comply with the necessity and minimization requirements of Title III. Parrilla

Mem. 10; Tang Yuk Suppression Mem. 3.  As explained below, the orders complied with the necessity requirement, and the Government provided an unrebutted demonstration of *prima facie* compliance with the minimization requirement.  Tang Yuk and Parrilla's motions to suppress wiretap evidence for Title III violations are therefore denied.

### A.    The Necessity Requirement

Parrilla and Tang Yuk challenge four wiretap orders on the basis of failure to meet the necessity requirement of 18 U.S.C. § 2518.  Tang Yuk challenges (1) Judge John G. Koetl's January 31, 2013, order authorizing interceptions on a phone number ending in 3175 that Tang Yuk used to communicate with CW-1 in October 2012, Conniff Decl. Ex. B; and (2) Judge Kimba M. Wood's March 12, 2013 order authorizing an additional wiretap on the Tang Yuk 3175 phone, as well as a wiretap of a phone number ending in 5444, associated with Parrilla, Conniff Decl. Ex. D, Watts Aff. Ex. D.  Tang Yuk Suppression Mem. 5.  Parrilla also challenges the March 12 order, as well as (3) Judge Wood's April 22, 2013, order authorizing interceptions on a phone number ending in 9494, also associated with Parrilla, Watts Aff., Ex. E; and (4) Judge Harold Baer's April 25, 2013 order reauthorizing interceptions on the 9494 phone, Watts Aff., Ex. F.  Parrilla Mem. 10.

The accused bears the burden of proving that necessity for a wiretap was lacking.  *United States v. Magaddino*, 496 F.2d 455, 459–60 (2d Cir. 1974).  In conducting its inquiry, the Court presumes that the wiretap orders were valid, *see United States v. Zapata*, 164 F.3d 620 (2d Cir. 1998), and grants "considerable deference" to the original judge's decision granting a Title III interception order.  *United States v. Concepcion*, 579 F.3d 214, 217 (2d Cir. 2009) (quoting *United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997)).  This deferential review "ensur[es] only that 'the facts set forth in the application were minimally adequate to support the determination that was made.'"  *Id.* (quoting *Miller*, 116 F.3d at 663); *see also United States v. Gigante*, 979 F. Supp. 959, 963 (S.D.N.Y. 1997) ("Unaided by the insights of adversarial scrutiny, the issuing judge may not readily perceive every question that might legitimately be

raised regarding a requested surveillance; but so long as fundamental constitutional rights are preserved, the issuing court's determination should not be subjected to gratuitous 'Monday morning quarterbacking.'").

Title III requires each application for a wiretap order to include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," and the authorizing court must determine that a wiretap is necessary because "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c), (3)(c).

Each application for the challenged wiretap orders included an affidavit describing the Government's attempts to use normal investigative procedures and reasons for needing a wiretap. Based on these representations, each authorizing judge found that the government had adequately established that it had tried normal investigative techniques, but they had failed, or reasonably appeared unlikely to succeed if tried, or reasonably appeared to be too dangerous.

Disputing these statements and findings, the Defendants argue that the Government's Title III applications failed to adequately establish that wiretap orders were needed, and that the issuing judges therefore erred in granting the applications. The Government responds that the wiretap orders comply with the statutory requirements. For the reasons below, the Court finds that the Defendants fail to meet their burden of "proving that necessity for the wiretap[s] was lacking." *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 483 (S.D.N.Y. 2013) (citing *Magaddino,* 496 F.2d at 459–60).

First, both Defendants claim the supporting affidavits impermissibly relied on boilerplate applicable to any narcotics case. Parrilla Mem. 22 ("The affidavits in support of the applications in this case rely almost exclusively on generalized, boilerplate language that could apply to any narcotics case."); Tang Yuk Suppression Mem. 9 ("[T]he government . . . inappropriately rel[ied] on boilerplate investigative inadequacies common to most narcotics investigations and which had nothing to do with the government's ability to gather information about . . . Tang Yuk.").

In fact, while the applications did include some generic language arguably applicable to any similar narcotics investigation, they also provided numerous factual details specific to this investigation. For example, the applications' claims that undercover officers were not a viable alternative to wire and electronic surveillance were based on the cooperating witness's statements about the defendants, not "generalized and conclusory statements that the other investigative procedures would prove unsuccessful." *Concepcion*, 579 F.3d at 218; *see, e.g.*, Johnston Aff., Mar. 12, 2013, at 44 ("CW-1 has confirmed . . . that he would be unable to introduce an undercover officer . . . because Thomas, Tang Yuk, and Parrilla are hesitant to deal with outsiders.").

In discussing numerous other traditional investigative techniques that had been tried or rejected—including the use of cooperating witnesses, physical surveillance, pole cameras, geolocation information, telephone records, grand jury process and witnesses interviews, search warrants, arrests, trash searches and financial investigations—the applications made substantial presentations of facts specific to this case. Testing the Government's showing "in a practical and commonsense fashion," *Concepcion*, 579 F.3d at 218 (quoting S.Rep. No. 90–1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2190) (internal quotation marks omitted), the materials provided adequately "inform[ed] the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Id.* (quoting *United States v. Diaz*, 176 F.3d 52, 111 (2d Cir. 1999)) (internal quotation marks omitted).

Next, Parrilla complains that "law enforcement never tried to utilize undercover agents so there was no way of knowing whether the[ir] use . . . would have proven successful." Parrilla Mem. 19. Similarly, Tang Yuk points out that the Government does not address him specifically in rejecting the use of pole cameras and geolocation information. Tang Yuk Suppression Mem. 11. As discussed above, the Government provided specific reasons for rejecting the use of undercover agents without trying to use them. Moreover, Title III does not require "that any particular investigative procedures be exhausted before a wiretap may be authorized," *United*

*States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (internal quotation marks omitted), so these complaints that certain procedures were not tried or explained are unavailing. "[T]he Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." *Concepcion*, 579 F.3d at 218.

Tang Yuk also argues that the government failed to show necessity because it "had no reason to believe that interceptions of the 3175 Cellphone would lead to any information regarding the DTO's 'sources of supply,' because they knew Mr. Tang Yuk was not the source." Tang Yuk Reply 1. But the Government sought the interception order for many purposes in addition to discovering "the source . . . of contraband." *See* Johnston Aff. Mar. 12, 2013, at 5.[3] Knowledge that Tang Yuk was not personally the source does not make the interception unnecessary for the numerous other objectives of the investigation.

Granting considerable deference to the decisions granting the Title III interception orders, the Court finds that the facts set forth in the applications were more than minimally adequate to support the authorizing judges' necessity findings. Although "generalized and conclusory statements that the other investigative procedures would prove unsuccessful" are insufficient, *Concepcion*, 579 F.3d at 218, the applications here provided significant details. Because the necessity requirement is not "an insurmountable hurdle and only requires that the Government demonstrate that normal investigative techniques would prove difficult," *United States v. Levy*, No. 11 Cr. 62 (PAC), 2012 WL 5830631, at *4 (S.D.N.Y. Nov. 16, 2012) (citation omitted), the

---

[3] Agent Johnson's affidavit stated in full that:
[T]he objectives of the interception sought herein are to reveal to the greatest extent possible: (i) the nature, extent and methods of the Target Subjects' commission of the Target Offenses; (ii) the identities of the Target Subjects, to the extent currently unknown, as well as their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iii) the source, receipt, and distribution of contraband, and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records; (vi) the locations and sources of resources used to finance their illegal activities; (vii) the locations and disposition of the proceeds from and relating to those activities; and (viii) the location and other information necessary to seize and/or forfeit contraband, money and items of value, and other evidence of or proceeds of the commission of the Target Offenses.
Johnston Aff. Mar. 12, 2013, at 5.

Court concludes that the authorizing judges did not err in determining that wiretaps were necessary.

### B.    The Minimization Requirement

Parrilla also moves to suppress wiretapped communications on the basis that the government failed to conduct the surveillance "in conformity with the order of authorization or approval," 18 U.S.C. § 2518(10)(a), by failing to properly minimize throughout the entirety of the investigation.[4]  Parrilla claims that the government's statistical reports show that the government failed to properly minimize throughout the entirety of the investigation, "monitor[ing] substantial numbers of mundane, personal conversations wholly irrelevant to the investigation." Parrilla Mem. 25–27. The Government opposes and argues that the Defendants failed to show any minimization violation warranting suppression occurred.  For the reasons below, the Court finds that the Government made a *prima facie* showing of compliance with the statutory minimization requirement, and that Parrilla failed to rebut that showing by establishing that a substantial number of non-pertinent conversations were intercepted unreasonably. Accordingly, the minimization challenge fails and Parrilla's Title III motion to suppress is denied.

Under Title III, surveillance must "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). Surveilling agents are not forbidden from intercepting all non-relevant conversations, but must minimize such interceptions. *See United States v. Kazarian*, No. 10 Cr. 895 (PGG), 2012 WL 1810214, at *13 (S.D.N.Y. May 18, 2012).

When a defendant moves to suppress for failure to minimize, "[t]he Government has the burden of making a *prima facie* showing of compliance with the statutory minimization

---

[4] Tang Yuk asserts in a footnote that "the government was not properly minimizing calls intercepted under the Title III warrants," but does not separately move to suppress on this basis. Tang Yuk Suppression Mem. 7 n.4. Regardless, the statistical summaries relating to the interceptions on the Tang Yuk phone are roughly similar to those challenged by Parrilla.  As discussed below, the government demonstrated *prima facie* compliance with the minimization requirement, so Tang Yuk has the burden of proving it was violated.

requirement." *Id.* at *14 (citations omitted).  To make the required showing of *prima facie*
compliance, the Government can show that it (1) maintained monitoring logs; (2) allowed
judicial supervision of the progress of the surveillance; (3) provided written and oral instructions
to monitoring personnel concerning the legal requirements for minimization; (4) required all
monitoring personnel to read the court orders and applications; (5) posted the minimization
instructions, court orders, and applications at the monitoring plant; and (6) used the prosecutor to
supervise surveillance. *Kazarian*, 2012 WL 1810214, at *14 (quoting *Salas*, 2008 WL 4840872,
at *8).

 The Government represents that an Assistant United States attorney supervised the
surveillance effort; that once each surveillance order was authorized, the AUSA provided oral
instructions to agents and monitors about the legal requirements for minimization; that
instructions were posted in the monitoring room; and that while conducting surveillance, the
agents and monitors maintained contemporaneous monitoring logs (line sheets) that were
reviewed by the supervising prosecutor.  Parrilla challenges none of these representations.  The
Government's exhibits also show that the supervising AUSA also provided written instructions.
*See* Gov. Mem. Exs. C, F, G (Wiretap Monitoring and Minimization Instructions).  These
instruction sheets show that agents and monitors signed to acknowledge they had read or heard
the instructions.  *See id.*  Finally, the Government provided updates to the authorizing judges on
progress of the surveillance, including statistical summaries of the minimization efforts.  *See*
Gov. Mem. Exs. D, E, I, J, K (Periodic Reports).

 These facts demonstrate *prima facie* compliance with the minimization requirement, so
the burden shifts to Parrilla to show that "a substantial number of non-pertinent conversations
have been intercepted unreasonably," "despite a good faith compliance with the minimization
requirements." *Kazarian*, 2012 WL 1810214, at *14 (citations and internal quotation marks
omitted).  "Suppression is an appropriate remedy only where the agents' minimization efforts as
a whole were not objectively reasonable." *Id.* (citing *Scott v. United States*, 436 U.S. 128, 136–

37 (1978). "Where a defendant cannot make such a showing, courts generally reject a claim of improper minimization without a hearing." *Id.* (citations omitted).

Parrilla bases his argument in statistics, arguing that the Government's periodic reports—indicating the percentages of calls intercepted, minimized, and flagged pertinent—show a "failure to properly minimize . . . [that] pervades the entirety of discovery." Parrilla Mem. 27. Parrilla cites reports showing that a large numbers of intercepted calls were neither minimized nor flagged as pertinent. *Id.* at 25–26.[5] However, the overall statistical picture he presents ignores the well-established Second Circuit rule that short calls are per se excluded from the minimization requirement. The Second Circuit has instructed that two minutes is "too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation," *United States v. Capra*, 501 F.2d 267, 276 (2d Cir. 1974) (citation and internal quotation marks omitted), so the interception of all calls lasting two minutes or less does not violate the minimization requirement. *See Kazarian*, 2012 WL 1810214, at *13.

Removing the short calls from the tallies, the statistical summary does not suggest "flagrant disregard of the minimization requirement[]," Parrilla Mem. 24, but merely the fact that the vast majority of calls were exempt from it. In the reports Parrilla cites, the percentage of calls lasting less than two minutes varied from 88 to 97 percent, and the overall percentage was 93 percent. *See* Watts Aff. Exs. G–J.

Because Parrilla bears the burden of showing that substantial number of non-pertinent conversations were intercepted unreasonably, he must do more to rebut the government's *prima facie* showing of compliance by, for example, identifying specific violations or calls that agents unreasonably failed to minimize. *See United States v. Sang Bin Lee*, No. 13 Cr. 461 (JMF), 2014 WL 144642, at *7 (S.D.N.Y. Jan 15, 2014); *Kazarian*, 2012 WL 1810214, at *17; *United States*

---

[5] In the orders Parrilla cites, 3,681 calls were intercepted altogether, but only 122 calls were minimized, and 133 calls were flagged as pertinent, leaving 3,426 calls that were not minimized or flagged as pertinent. *See* Parrilla Mem. 24–27; Watts Aff. Ex. G, at ALL000485 (510 calls from March 12 to March 21, 2013, 18 minimized, 32 flagged pertinent); Ex. H, at ALLL000496 (537 calls March 22 to 31, 14 minimized, 19 pertinent); Ex. I, at ALL000726 (1,236 calls April 22 to May 1, 42 minimized, 37 pertinent); Ex. J, at ALL000741 (1,398 calls May 2 to May 11, 48 minimized, 45 pertinent).

*v. Estrada*, No. 94 Cr. 186, 1995 WL 577757, at *7 (S.D.N.Y. Sept. 29, 1995) (denying motion to suppress because defendants did not identify any specific violations).  He has not done so.

Moreover, the Government identifies several relevant facts and circumstances that made minimization especially challenging, including coded language and local accents, Gov. Mem. 24, and Parrilla's reply does not address his wiretap challenge.  Although the "percentage of nonpertinent calls intercepted . . . may provide assistance" in determining whether agents have acted reasonably and complied with the minimization requirement, *Scott*, 436 U.S at 140, "[c]ompliance with the minimization requirement is measured by the reasonableness of the surveilling agents' conduct, which 'will depend on the facts and circumstances of each case.'" *Kazarian*, 2012 WL 1810214, at *13 (quoting *Scott*, 436 U.S. at 140).  Despite possessing the linesheets which he claims indicate unreasonable monitoring, Parrilla's moving papers do not specifically identify any minimization violations.  All Parrilla offers to show the interceptions were unreasonable is the flawed statistical analysis discussed above and a conclusory statement that the line sheets reflect that "the agents monitored substantial numbers of mundane, personal conversations wholly irrelevant to the investigation."  Parrilla Mem. 25–27.  Such a showing is inadequate to rebut the *prima facie* showing of compliance or to make a hearing necessary.  *See Kazarian*, 2012 WL 1910214, at *17.  Parrilla's motion to suppress the wiretap orders for failure to adhere to the minimization requirement is denied.

### C.   *Franks* Hearing

In the alternative, Parrilla requests an evidentiary hearing to resolve the motion to suppress wiretap evidence.  Parrilla Mem. 27.  Tang Yuk alleges an omission in the wiretap applications, but does not specifically request a hearing.  Tang Yuk Suppression Mem. 8.

To obtain an evidentiary hearing on a motion to suppress evidence obtained through a Title III interception order on the basis of errors or omissions in the application, a defendant must make a substantial preliminary showing that "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the

alleged falsehoods or omissions were necessary to the issuing judge's probable cause or necessity finding." *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (quoting *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000)) (internal quotation marks and alterations omitted). Without "a substantial preliminary showing that the Government made a misleading misstatement or material omission . . . the defendant does not obtain a *Franks* hearing." *Levy*, 2012 WL 5830631 at *5 (citations omitted).

Parrilla does not allege that the applications or affidavits in support contain any inaccuracies or omissions at all, so no hearing is necessary. Tang Yuk did not request a hearing, except through the joinder of the co-defendants' motions. Regardless, Tang Yuk made no attempt to demonstrate that the omission was intentional or reckless. Thus neither Defendant comes close to making the necessary substantial preliminary showing, so no evidentiary hearing will be held. The Title III motions to suppress are denied.

## V.    TANG YUK MOTION TO DISMISS, SEVER, OR CHANGE VENUE

Tang Yuk moves to dismiss the indictment on the grounds that the single conspiracy count improperly joins two unrelated conspiracies. In the alternative, he moves to be severed from his co-defendants, and if severed, challenges venue in this district and requests transfer to Florida. The Government opposes these motions. The Court concludes that joinder is proper and denies Tang Yuk's motion in full.

Rule 8 allows joinder of two or more defendants in an indictment when "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The Second Circuit interprets the phrase "same series of acts or transactions" to require that the alleged criminal acts either be "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." *United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (internal quotation marks and citation omitted).

Tang Yuk argues that the indictment fails to allege a single conspiracy, and instead alleges a legally defective "rimless wheel" conspiracy. Tang Yuk Dismissal Mem. 2. Parsing the evidence provided in discovery, Tang Yuk argues that the Government's proof does not show one conspiracy by Parrilla, Thomas, Tang Yuk, and others, but at least two separate conspiracies with a common hub. Assuming for purposes of the motion that he conspired to distribute two kilograms of cocaine in Florida, Tang Yuk argues the Government has not alleged he was part of the alleged conspiracy to import 80 kilograms of cocaine from Saint Croix to the United States. Tang Yuk Dismissal Mem. 1 n. 2, 4.

But Tang Yuk's claim that "the government has no proof of a common plan," Tang Yuk Dismissal Reply at 5, is not a basis to dismiss the indictment for misjoinder. To the contrary, "[u]nder the plain language of Rule 8(b), the decision to join parties turns on what is 'alleged' in the 'indictment.'" *Rittweger*, 524 F.3d at 178. The Second Circuit has warned that the plain language of Rule 8(b) precludes "consideration of pre-trial representations not contained in the indictment, just as the language of the Rule does not allow for consideration of evidence at trial." *United States v. Rajaratnam*, 753 F. Supp. 2d 299, 306 (S.D.N.Y. 2010) (quoting *Rittweger*, 524 F.3d at 178 n. 3). The Court thus measures the Indictment "by the language the government has actually used in charging the defendants with their alleged crimes," "not by what the government could have alleged or what it hopes to prove." *Rajaratnam*, 753 F. Supp. 2d at 307 (noting that the government "crafts a barebones indictment at its own risk").

Measured under this test, the Indictment properly alleges a single conspiracy, wherein the defendants agreed together to distribute five kilograms and more of cocaine. This allegation has a common identity of facts and participants, and alleges a common plan or scheme. *See Rittweger*, 524 F.3d at 177. Thus the indictment sufficiently alleges that the defendants "have participated in the same act or transactions . . . constituting an offense." Fed. R. Crim. P. 8(b); *see United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988) ("The mere allegation of a conspiracy presumptively satisfie[s] Rule 8(b).") (citation omitted).

Whether the government can prove its allegation that Tang Yuk entered into a common plan or scheme with his codefendants is a matter for trial because "[t]he matter of whether there existed a single conspiracy as charged in the indictment or multiple conspiracies is a question of fact for a properly instructed jury." *United States v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008). Tang Yuk's unripe sufficiency challenge is inappropriate for resolution on a pretrial motion to dismiss. *United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *3 (S.D.N.Y. Dec. 3, 2013).

In the alternative, Tang Yuk moves for a severance pursuant to Rule 14 and a transfer to the Southern District of Florida, for lack of venue. Tang Yuk Dismissal Mem. 8.

Rule 14 provides that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant . . . , the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). The federal system prefers joint trials of defendants indicted together. *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Some prejudice is allowed, but severance must occur when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Rittweger*, 524 F.3d at 179 (quoting *Zafiro*, 506 U.S. at 539) (internal quotation marks omitted).

"[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Stein*, 428 F. Supp. 2d 138, 143 (S.D.N.Y. 2006) (citations omitted). Contrary to Tang Yuk's contention that severance is warranted because "[n]o limiting instruction could overcome the prejudicial 'weight' of the unrelated evidence," Tang Yuk Dismissal Mem. 10, "[t]he possibility that some incriminating evidence will be admissible only against certain defendants does not, as defendants assert, justify severance." *Stein*, 428 F. Supp. 2d at 144. In any event, "[b]ecause all defendants are charged with the same conspiracy, much of the evidence would be admissible against each defendant, even in a separate trial," and the Second Circuit considers such evidence "neither spillover nor prejudicial." *Id.* (quoting *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993))

(internal quotation marks omitted). Recognizing the "continuing duty at all stages of the trial to grant a severance if prejudice does appear," *Rittweger*, 524 F.3d at 179 (quoting *Schaffer v. United States*, 362 U.S. 511, 516 (1960)) (internal quotation marks omitted), the Court declines at this time to sever Tang Yuk from his codefendants pursuant to Rule 14.

Given the Court's denial of his motions to dismiss or to sever the indictment at this time, Tang Yuk's claim that venue would be lacking in a solo trial is moot, as is his motion to transfer the case to Florida upon severance. Tang Yuk's motion for dismissal, severance, and change of venue is therefore denied in its entirety. The Defendant may re-raise this argument in limine or at trial if specific contentions of prejudice are apparent.

## VI.    THOMAS MOTION TO TRANSFER

Gary Thomas moves to transfer the case for trial in the Saint Croix Division of the District of the Virgin Islands pursuant to Fed. R. Crim P. 21(b).[6] For the reasons discussed below, the relevant factors do not support transfer, so this motion is denied.

Gary Thomas lives in Saint Croix, United States Virgin Islands, and owns Paradise Waste Systems, a waste management company there. The Indictment alleges that in furtherance of the alleged conspiracy, Thomas packaged a shipment of eighty kilograms of cocaine in Saint Croix and shipped it to Florida, where it was divided and distributed in Florida and New York by his co-conspirators.

"As a general rule a criminal prosecution should be retained in the original district." *United States v. United States Steel Corp.*, 233 F. Supp. 154, 157 (S.D.N.Y. 1964). But "[u]pon the defendant's motion, the court may transfer the proceeding, or one or more counts, against

---

[6] Thomas refers in his motion to "transferring the case against Mr. Thomas." Thomas has not moved to sever his trial from that of his co-defendants. However, where "[t]here is no assertion that the [proposed venue] . . . would be more convenient for anyone other than" the party moving for a change of venue, the court must "sever[] [petitioner] from the co-defendants," if the court grants the motion to change venue. *See United States v. Freeman*, No. 2:06CR20089–017, 2009 WL 2222969, at *2 n. 4 (W.D. La. July 23, 2009).

that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b). The Court will consider

> (1) location of [the] defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer.

*Platt v. Minn. Min. & Mfg. Co.*, 376 U.S. 240, 243–44 (1964). However, "[n]o one of these considerations is dispositive, and it remains for the court to try to strike a balance and determine which factors are of greatest importance." *United States v. Maldando-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990) (internal quotation marks omitted).

Thomas is a resident of Saint Croix, his family and business are located in Saint Croix, and he has only occasionally visited New York. But Thomas's residence "is [neither] dispositive [n]or has independent significance in determining whether transfer is warranted." *United States v. Riley*, 296 F.R.D. 272, 276 (S.D.N.Y. 2014) (citing *Platt*, 376 U.S. 240; *Maldando-Rivera*, 922 F.2d 934). "While the Supreme Court has said that the defendant's residence has no 'independent significance,' and should not be given dispositive weight[,] the fact that" Thomas resides in Saint Croix "weighs in favor of the transfer of venue, absent other countervailing considerations." *United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 456 (S.D.N.Y. 1997) (internal citation omitted). Thus, the location of the defendant favors transfer and is the strongest factor in support of transfer.

Thomas proffers that two to five defense witnesses reside in Saint Croix. He further states that he expects the government to also call witnesses who are based in Saint Croix. These facts, however, are insufficient to weigh into the determination of whether venue should be transferred. Thomas "does not allege or attempt to show that these witnesses would be unable to testify in New York, that he would be unable to call them, or that he would be financially incapable of paying such witnesses' expenses." *United States v. Ebbers*, No. 02 Cr. 1144 (BSJ),

2004 WL 2346154, at *1 (S.D.N.Y. Oct. 18, 2004).  In *Ebbers*, the defendant similarly argued that defense witnesses, as well as a few of the government's witnesses, were located out of state. *See id.*  Even if the location of witnesses slightly favors transfer, this factor has relatively little weight "in this age of easy air travel." *Id.*

The alleged conspiracy includes events located in Saint Croix, Florida, and New York. Although Thomas's acts are alleged to have taken place in Saint Croix, the scope of the alleged conspiracy reaches to New York, even though Thomas is not based here.  *See Spy Factory, Inc.*, 951 F. Supp. at 457 (holding that the Southern District of New York is an appropriate venue where the defendant illegally sold products to individuals in this district, even though defendant was based in Texas).  The location of the most events is Florida, so the fact that New York is the site of fewer events than Saint Croix at most mildly favors transfer.

While a number of Thomas's records are located in Saint Croix, Thomas does not explain why these documents cannot be easily accessed in New York.  "Given the conveniences of modern transportation and communication location of relevant documents is of little consequence one way or the other." *United States v. Layne*, No. 05 Cr. 87 (HB), 2005 WL 1009765, at *4 (S.D.N.Y. May 2, 2005).  Where, as here, all documents should be available electronically, the location of documents and records "does not favor either retaining or transferring the action." *Id.*

Thomas contends that the operations of his business, Paradise Waste Systems, will be disrupted by a trial held in New York.  Thomas never alleges, specifically, why his absence from his physical place of business will cause more disruption if he is on trial in New York rather than in Saint Croix.  In either location a trial will disrupt Thomas' ability to run his business.  Thomas vaguely contends that his business would be disrupted because he does work that no one else is able to do, but does not provide details. *See United States v. Guastella*, 90 F. Supp. 2d 335, 340 (S.D.N.Y. 2000) ("Defendant[] ha[s] not supplied the Court with any facts indicating how [his] business[] . . . would be disrupted by trial in this district.").  Accordingly, the possibility of disruption to the defendant's business weakly favors transfer.

Standing trial in New York will cause Thomas to incur additional expenses, but a trial in Saint Croix will increase expenses for the government.  Since Thomas "does not claim that he cannot pay his defense costs and other expenses for trial in New York," and severance would increase expenses, the expense to the parties does not favor transfer.  *Ebbers*, 2004 WL 2346154, at \*2.  All counsel are located in New York, so the location of counsel favors retention, notwithstanding defense counsel's indication that he could also easily try the case in Saint Croix.

The parties agree that both New York and Saint Croix are easily accessible.  While Thomas argues that this factor weighs in his favor, he does so by reiterating the Saint Croix would be more convenient, not that New York is inaccessible.  Therefore, the accessibility factor is neutral.  Docket conditions do not provide a reason for transfer, as the "Court already has scheduled trial in this case, [which] ensur[es] that [Thomas] will receive ample attention regardless of docket conditions."  *United States v. Stein*, 429 F. Supp. 2d 633, 645 (S.D.N.Y. 2006).  Finally, Thomas surmises that "[i]t is not so clear" that venue lies in the Southern District of New York but does not claim venue is lacking.

The only *Platt* factor that strongly favors transfer is the residence of the defendant.  Because "defendant's residence . . . should not be given dispositive weight" this factor alone cannot support transfer.  *Spy Factory, Inc.*, 951 F. Supp. at 456.  Thomas has not presented compelling reasons for severance and transfer, so his motion to transfer is denied.

## VII.   CONCLUSION

The Defendants' motions for joinder are granted.  Tang Yuk and Thomas' motions are DENIED.  Parrilla's motions are DENIED in part, and the Court reserves judgment on the issues arising from the canine sniffs.  This resolves Dkt. Nos. 74, 78.

SO ORDERED.

Dated: _____, 2014         _____
       New York, New York             ALISON J. NATHAN
                                       United States District Judge

24